**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| LISA M. PALLO, | : | CIVIL ACTION NO. 15-7385 (MLC) |
| | : | |
| Plaintiff, | : | **MEMORANDUM OPINION** |
| | : | |
| v. | : | |
| | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**COOPER, District Judge**

The plaintiff, Lisa M. Pallo ("Pallo"), seeks review of the final decision

("Decision") of an administrative law judge ("ALJ") issued on behalf of the defendant,

Commissioner of the Social Security Administration ("Commissioner"), denying her

claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI") (collectively "Benefits").  (See dkt. 1, Compl.; dkt. 5-2 at 13-23, Decision.)[1]  See

42 U.S.C. § 405(g).  The Commissioner asks the Court to affirm the Decision.  (Dkt. 10.)

The Court, having carefully reviewed both the administrative record and the parties'

submissions, will affirm the Decision.

---

[1] The Court will cite to the documents filed on the Electronic Case Filing System
("ECF") by referring to the docket entry numbers by the designation of "dkt."  Pincites reference
ECF pagination.

## BACKGROUND

At the time of her March 12, 2015 hearing before the ALJ, Pallo was 32 years old. (Dkt. 5-2 at 29.)  Pallo is a high school graduate.  She completed her education in June of 2001.  (Dkt. 5-6 at 31.)  She was subsequently employed as a customer service representative for approximately seven years.  (Id.)  She stopped working in July of 2009 because she "was pregnant and had too much vertigo to work."  (Id. at 30.)

On December 3, 2011, Pallo was involved in a car accident.  (See dkt. 5-7 at 2-6.) She was the driver of a vehicle that was rear ended while stopped.  She was examined the same day at Saint Barnabas Medical Center Emergency Room, complaining of lower back pain.  (Id. at 3.)  She was diagnosed with muscular strain, prescribed Valium and Naprosyn, and discharged.  (Id. at 5.)  Prior to the December 3, 2011 car accident, Pallo had no history of injury or symptoms related to her head, neck, back, shoulders, knees, or extremities.  (Dkt. 5-8 at 120.)

Pallo was examined by an orthopedist on December 12, 2011.  At that time, she "complained of continued pain in her jaw, right side of her back, right wrist, and right knee."  (Id.)  She also complained of headaches and indicated that her symptoms were getting worse.  (Id.) The examining orthopedist conducted a physical examination finding tenderness in the lower back area and right knee.  (Id.)  The orthopedist referred her for MRI study of the lumbar spine and right knee, and physical therapy treatment.  (Id.)

Pallo returned to the orthopedist for evaluation on January 17, 2012.  She continued to complain of "constant low back pain and giving way of her right knee," but indicated that her right wrist symptoms were improving.  (Id. at 107.)  On physical examination, the

2

orthopedist found that "range of motion of the back was limited with pain" and "right knee motion was limited with pain." (Id.)

Pallo received conservative physical therapy treatment at the care of her orthopedist, but did not respond positively. (See id.) As a result, she was referred to a pain management specialist, who evaluated Pallo on April 11, 2012 and recommended she try acupuncture and chiropractic treatment. (Id.) She was also referred to a neurologist for symptoms related to her right wrist. (Id.)

After eight months of chiropractic therapy and four months of acupuncture therapy, Pallo reported only temporary relief of her symptoms. (See id. at 108.) On December 19, 2012, her neurologist recommended facet nerve block[2] for diagnostic and therapeutic purposes, however Pallo declined the recommendation. (Id.) Pallo was evaluated again by her orthopedist approximately a month later and reported no change in her symptoms at that time. (See id.)

On April 10, 2013, Pallo completed an Adult Function Report. (Dkt. 5-6 at 5-12.) She reported that, on a typical day, she makes breakfast, sits with her son while he plays, makes lunch/dinner, and puts her son to sleep. (Id. at 5.) She also reported that she cares for her son, which included basic cooking and bathing. (Id.) She indicated she has difficulty sleeping, and cannot stand, walk, or sit for long periods of time. (Id. at 6.) She indicated she has no difficulties with personal care, prepares her own meals daily, and

_____

[2] A facet nerve block is a procedure in which an anesthetic is injected into an area that is suspected as a generator of pain. See Lee R. Russ, et al., 7 Attorneys Medical Advisor § 71:161 (2016).

performs some housework for periods of up to 45 minutes.  (Id. at 7.)  She reported that she goes outside once a week and drives, but has trouble with anxiety, panic attacks, and pain.  (Id. at 7-8.)  She indicated that she shops in stores and by computer.  (Id. at 8.)  She also reported that she pays bills, counts change, and uses a checkbook/money order, but has trouble remembering account balances.  (Id.)  She indicated that she does not spend time with others, but goes to the doctor and to her family's houses.  (Id. at 9.)  She also reported she has problems getting along with people. (Id.)

On May 28, 2013, Pallo underwent a mental consultative examination.  (See dkt. 5-9 at 78-81.)  She reported suffering from anxiety, depression, and sleep disturbance.  (See id. at 78-79.)  She stated that her symptoms of anxiety and depression began after her motor-vehicle accident in 2011.  (Id.)  She indicated she was not in psychiatric treatment at the time of her examination, and never sought psychiatric treatment for these disorders.  (Id. at 79.)  She explained that her primary care physician prescribed Xanax and referred her to a psychiatrist, however she could not get an appointment with a psychiatrist who would accept her health care.  (Id. at 78.)  On mental status examination, the doctor found the following:

> [Pallo] was coherent, relevant, and revealed no abnormalities.  Affect was appropriate to the thought content.  Mood was depressed and anxious. Thoughts were goal directed.  Mood was appropriately cheerful at times. Thoughts were goal directed. . . .
>
> She was alert and oriented to time, place, and person except being off on the exact date by about five days. . . . She was able to recall two out of three objects after five minutes.  She was able to comprehend and follow instructions and the topic of conversation.  She had difficulty with serial seven subtractions; she seemed to have some difficulty with concentration and it took her a long time while making some mistakes.  She seemed to get

4

overwhelmed.  Her fund of knowledge was inadequate, stating that she does not pay attention to what is happening in the world.  She abstracted well on one proverb, could not answer the second proverb, and her answer was concrete on the third proverb.  There were no abnormalities of posture or gait.  She did not exhibit any involuntary movements.

(Id. at 80-81.)  Pallo was diagnosed with posttraumatic stress disorder, anxiety disorder not otherwise specified, and major depressive disorder, single episode, severe, without psychotic features, chronic.  (Id. at 81.)

On June 5, 2013, Pallo saw a psychiatrist for a consultative orthopedic examination.  (See dkt. 5-9 at 82-83.)  The psychiatrist's impression was that Pallo had a history of non-radicular low back pain, and that she had normal functions of her hands for fine and gross motor manipulations.  (Id. at 83.)

On June 10, 2013, a Disability Determination Service ("DDS") psychologist reviewed Pallo's file and concluded that Pallo had the following medically determinable impairments: "spine disorders," "anxiety disorders," and "affective disorders."  (Dkt. 5-3 at 8, 22.)  The DDS psychologist noted that Pallo had mild restrictions in her activities of daily living, moderate difficulties in concentration, persistence, or pace, and no episodes of decompensation.  (Id. at 8, 22)  However, the DDS psychologist opined that Pallo retained sufficient mental Residual Functional Capacity ("RFC") for simple work.  (Id. at 12, 26.)  On November 8, 2013, another DDS psychologist reviewed Pallo's file and agreed with the prior opinions and conclusions of the other psychologist.  (See id. at 31-63.)

On August 23, 2013, Pallo submitted an additional Adult Function Report with the assistance of legal counsel.  (See dkt. 5-6 at 45-52.)  She indicated her mother and family assist her in caring for her son.  (Id. at 46.)  She indicated she now had difficulty caring for

herself.  (Id.)  She also reported she no longer prepared her own meals and is unable to complete household chores.  (Id. at 47-48.)  She indicated that she still goes out once or twice a week and drives, but only short distances.  (Id. at 48.)  She reported her mother now does all of the shopping.  (Id.)  She reported she was still able to pay bills, count change, use a checkbook/money orders, and is now able to handle a savings account.  (Id.)

From August 2013 to July 2014, Pallo was also treated by her primary care physician for various ailments and sought a referral for bariatric surgery.  (See dkt. 5-9 at 122-140.)  She was prescribed Xanax in August 2013 for anxiety, however this prescription was discontinued the following month.  (See id. at 122, 130.)

On July 30, 2014, prior to bariatric surgery, Pallo underwent a psychological evaluation in connection with that procedure.  (See dkt. 5-10 at 99-100.)  The clinical psychologist noted that Pallo presented herself in a "cooperative, open and clear manner" and seemed "highly motivated to lose weight to improve her health and her quality of life." (Id. at 99.)  The clinical psychologist indicated that Pallo had met with a dietician twice and had an additional meeting scheduled.  (Id.)  Pallo indicated she was following the dietician's suggestions and instructions, including eliminating sugars and consuming more protein, which resulted in her losing 12 pounds.  (Id.)  Pallo described herself as being in "excellent health (other than her back) because 'she used to go to the gym every day.'" (Id.)  Pallo denied "any significant problems with depression" and explained that in response to her car accident "she had become 'mad,' not depressed, and stayed as active as she could."  (Id. at 99.)  Pallo informed the clinical psychologist that her family was

supportive of her efforts to eat and drink healthy. (Id.) Pallo also indicated that she had received "lots of advice and support" from her friends who have had bariatric surgery. (Id.)

In psychologically clearing Pallo for bariatric surgery, which she ultimately had, the clinical psychologist noted that Pallo "communicates a good understanding and thoughtful consideration of bariatric surgery, including potential complications, behavioral requirements, and possible pitfalls" and that she "seems highly motivated to lose weight to improve her quality of life and prevent spine surgery." (Id. at 100.) The clinical psychologist also noted that Pallo appeared to have "strong mental health." (Id.)

Following her bariatric surgery, Pallo received treatment for complaints of abdominal pain. (See dkt. 5-12 at 9-136.) A psychological examination was performed at that time and revealed she was able to express feelings easily, ask questions appropriately, and was calm and cooperative with intact judgment. (Id. at 60, 133.)

In March 2014, Pallo began seeing a doctor of osteopathic medicine on a monthly basis for opioid pain management treatment. (See dkt. 5-10 at 2.) In September 2014, that doctor completed a Physical Functional Capacity Questionnaire. (See id. at 2-6.) He indicated that Pallo had depression, somatoform disorder, and anxiety. (Id. at 3.) He opined that Pallo was "incapable of even 'low stress' jobs," explaining that her pain is worse moving and standing. (Id. at 3.)

## PROCEDURAL BACKGROUND

On March 25, 2013, Pallo filed a Title II application for DIB, and on April 2, 2013, she filed a Title XVI application for SSI. (Dkt. 5-5 at 2-9.) In both applications, Pallo alleged disability as of December 3, 2011 due to the following conditions stemming

7

from her car accident: "chronic pain, ruptured disc in back, carpal tunnel syndrome, panic attacks, depression, anxiety, [and] nerve damage in both legs." (See id. at 2-9; dkt. 5-3 at 2-3.)

Pallo's claims were initially denied on June 18, 2013, and again upon reconsideration on November 13, 2013. (Dkt. 5-4 at 2-7, 11-18; dkt. 5-3.) Pallo filed a request for a hearing before an ALJ, which was granted and held on March 12, 2015. (See dkt. 5-4 at 19-26; dkt. 5-2 at 24-40.)

At the hearing before the ALJ, Pallo testified that she suffers from carpal tunnel syndrome and that her back pain is severe. (Dkt. 5-2 at 30.) She indicated that back surgery had been recommended to her, but that she could not find a doctor that accepts her insurance to perform it. (Id. at 33-34.) She also indicated that no doctor ever recommended a carpal tunnel release procedure to her. (Id. at 34.) She stated that her depression and anxiety caused her to refrain from going out, and that she has a fear of driving. (Id. at 30.) However, she indicated she drove a few weeks prior to the hearing. (Id. at 33.) She stated the medication she takes makes her extremely dizzy, nauseous, and tired, and that she takes multiple naps a day. (Id. at 31.) However, she did not report the negative impact of medications to her doctor. (Id. at 36.) She testified that she could not perform a sedentary job because she cannot sit or stand for more than 15 minutes without pain, and cannot lift more than five pounds. (Id. at 32.)

During the same hearing, the ALJ took testimony from a vocational expert ("VE"). (See id. at 36-40.) The ALJ posed the following hypothetical to the VE:

I'm going to ask you to assume an individual of the claimant's age, education and work history. Assume further the individual is restricted to sedentary work. Assume additionally the individual is restricted to simple and repetitive jobs such as those involved in one and two-step processes to completion to account for side effects of pain and/or side effects of medication. Additionally, assume the individual can – is restricted to jobs that allow for frequent, but not continual fine finger manipulation bilaterally. With those limitations could such an individual perform any of this claimant's past relevant work [as a customer service representative]?

(Id. at 37.) The VE answered no, but indicated that with the described limitations, one may be able to work as: (1) a scale operator, sedentary, with a specific vocational preparation ("SVP") of 2; (2) a preparer, sedentary, with an SVP of 2; and (3) a table worker, sedentary, with an SVP of 2. (Id. at 37-38.)[3]

The ALJ posed a second hypothetical, asking the VE to assume the same limitations as noted in the first hypothetical, but to further assume the individual would

---

[3] "[SVP] is defined as the amount of lapsed time required by a worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational titles ("DOT"), App. C, 1991 WL 688702. It includes vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs. Id. The SVP rating is a numerical rating. The following chart explains those ratings:

| Level | Time |
|-------|------|
| 1 | Short demonstration only |
| 2 | Anything beyond short demonstration up to and including 1 month |
| 3 | Over 1 month up to and including 3 months |
| 4 | Over 3 months up to and including 6 months |
| 5 | Over 6 months up to and including 1 year |
| 6 | Over 1 year up to and including 2 years |
| 7 | Over 2 years up to and including 4 years |
| 8 | Over 4 years up to and including 10 years |
| 9 | Over 10 years |

Id.

9

be "restricted to occasional, but not frequent, fine finger manipulation." (Id. at 38.)
Under these assumptions, the VE testified that one may be able to work as: (1) a preparer,
sedentary, with an SVP of 2; (2) a weight tester, sedentary with an SVP of 2; and (3) a
hand mounter, sedentary, with an SVP of 2.  (Id.)

The ALJ posed a third hypothetical, asking the VE to again assume the same
limitation as noted in the first hypothetical, but to further assume the individual would be
"restricted to grasping and gross movements, but no fine finger manipulation."  (Id.)
Under these assumptions, the VE testified that at the sedentary, unskilled level, there
would be no jobs for such a person. (Id.)  The VE also testified that there would be no
jobs for a person with any combination of limitations that also included a limitation that
the individual would be off task from performing even jobs of simple and repetitive
nature or a limitation that the individual would be unable to go to work for three or more
days per month for any medical reason. (Id. at 39.)

The ALJ issued the Decision, which was unfavorable to Pallo, on May 14, 2015,
which announced the ALJ's findings of fact and conclusions of law.  (See dkt. 5-2 at 13-
23.)  The ALJ stated, inter alia, that:

1. [Pallo] meets the insured status requirements of the Social Security Act
   through December 31, 2014.
2. [Pallo] has not engaged in substantial gainful activity since December 3,
   2011, the alleged onset date[.]
3. [Pallo] has the following severe impairments: disorder of the back and
   carpal tunnel syndrome[.]

These impairments are considered "severe" under the Regulations because
the medical record supports a finding that they are medically determinable
impairments which, when considered either individually or in unison,
significantly limit [Pallo's] mental and physical abilities to do one or more

10

basic activities.  In addition, the record also supports a finding that the claimant's impairments have lasted at a "severe" level for a continuous period of more than 12 months.

Regarding [Pallo's] mental impairment, although the psychiatric consultative examiner diagnosed the claimant with major depressive disorder, anxiety disorder and post-traumatic stress disorder, the record reveals the claimant has never had any form of psychiatric treatment.  In addition, she takes no psychiatric medication.  Daily activities may or may not be limited but there is no reasonable medical basis demonstrated by the record for any such limitations.  I note the intake worker noted that [Pallo] appeared to be "dazed and confused" despite there being no allegations of cognitive issues.  Despite her not having any serious medical issues, the consultative examiner diagnosed her with multiple mental disorders, but offered no limitations nor an opinion on her Global Assessment of Functioning (GAF).  She does not see a psychiatrist allegedly because she cannot find one (testimony).

[T]he credible evidence cannot be accepted as showing limitations that would result in more than minimal, limitation in finding any severe mental impairment[.]   [I] disagree[] with the state agency physicians that the claimant has sufficient medical evidence demonstrating a debilitating mental condition.

[Pallo's] medically determinable mental impairment of Post-Traumatic Stress Disorder and depression and anxiety does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere.

In making this finding, I have considered the four broad functional areas set out in the disability regulations for evaluating mental disorders . . . .

The first functional area is activities of daily living.  [Pallo] has mild limitation.  The evidence . . . shows that [Pallo] is, for the most part, able to engage in activities of daily living in an appropriate and effective manner, on an independent and sustained basis.  She reported in her April 2013 function report that she was able to take care of her personal needs without difficulty.  She was able to take care of her son.  She also reported she could make simple meals, do light housework, drive a car, shop in stores and handle money.  Although she reported a significant reduction[.]

The next functional area is social functioning.  In this area, [Pallo] has no limitation.  The evidence . . . shows that [Pallo] is, for the most part, capable of interacting independently, appropriately, effectively, and on a sustained

basis with other individuals.  She [reported] that she has difficulty getting along with family and friends because she has anxiety, depression and anger issues.  However, [ ] she indicated that she visit[s] her family's houses.

The third functional area is concentration, persistence or pace.  In this area, [Pallo] has mild limitation.   Although [Pallo] reported difficulty concentrating and remembering, when examined by . . . Dr. Vasudev, she was able to comprehend and follow instructions and the topic of a conversation . . . . I find her ability to take care of her personal needs without difficulty, pay bills, take care of her son, prepare meals daily, shop in stores, and watch television for extended periods shows an ability to think, concentrate, to pay attention and to remember[,] all of which negate a diagnosis of severe disabling symptoms. . . . Moreover, at the hearing [Pallo] was able to answer all questions asked of her in an appropriate and timely manner, thereby demonstrating a level of concentration in the arguably stressful setting of a disability hearing.

The fourth functional area is episodes of decompensation.  [Pallo] has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it is nonsevere[.]
. . . .
4.  [Pallo] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]

The requirements of listing 1.02 have not been met because the evidence fails to establish an impairment "characterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s) . . . .

Medical Listing 1.04 is not met because the record does not demonstrate compromise of a nerve root . . . or the spinal cord . . . .

There is no specific medical listing regarding obesity, but I have evaluated the impairment herein pursuant to the extensive and detailed guidelines . . . . I have fully considered obesity in the context of the overall record evidence in making this decision.

Finally, as to [Pallo's] carpal tunnel syndrome, I note that there is no specific listing for carpal tunnel syndrome.  However, listings 11.00C [ ] and listing 1.00B can serve as a guide for evaluating carpal tunnel syndrome.

Listing 11.00C, as related to carpal tunnel syndrome, essentially requires documented evidence of persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, or ataxia and sensory disturbances, or interference with the use of fingers, hands and arms.  Listing 1.00B . . . essentially requires documented evidence that [Pallo] is unable to use [her] upper extremities effectively to be able to carry out activities of daily living.

In this case, the medical evidence of record does not demonstrate clinical findings showing that [Pallo] is unable to use [her] upper extremities effectively, within the residual functional capacity assessment found below. I therefore find that [Pallo's] carpal tunnel syndrome is not of listing level severity.

5.  . . . I find that [Pallo] has the residual functional capacity to perform sedentary work . . . except she is limited to frequent but not continual fine finger manipulation, bilaterally and due to side effect of pain and medication, she is limited to simple and repetitive tasks.

In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . . I have also considered opinion evidence in accordance with the requirements . . . .

In considering [Pallo's] symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) . . . .

Second, . . . I must evaluate the intensity, persistence, and limiting effects of [Pallo's] symptoms to determine the extent to which they limit [her] functioning.  [W]henever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record. . . . .
After careful consideration of the evidence, I find that [Pallo's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Pallo's] statements concerning the intensity,

persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

I note that the sedentary residual functional capacity is assessed based on the objective medical findings in the record. The record reflects [Pallo] under the care of Dr. Wolkstein in December 2011, following a motor-vehicle accident. She presented with complaints of pain in the back, right wrist and right knee. An MRI of the lumbar spine showed diffuse bulging of the L4L5 and L5-S1 disc and Grade I anterolisthesis of L5 in relationship to S1. An MRI of the right knee showed mild sprain of the proximal fibular collateral and lateral collateral ligaments and trace joint effusion. She received conservative treatment including physical therapy, chiropractic treatments, acupuncture and pain medication.

[Pallo] has complained of pain in her lower back and right knee, which limit [her] ability to sit, stand and walk. She reported that she is unable to do any daily activities and basically stays in bed most of the day. She reported that she is losing her ability to function to the point that she is unemployable. However, [Pallo's] longitudal medical history is not consistent with her allegation of disability. While the record shows the claimant was involved in a motor vehicle accident in December 2011 and as a result sustained injuries to her lower back and knee, the finding by the orthopedic consultative examiner are largely negative. She did not squat but she was able to walk on heels and toes. There was no significant abnormalities noted and straight leg raising was negative bilaterally. Examination of the lower extremities showed no tenderness, focal weakness or sensory loss in the knees. The doctor noted she had normal functions of her hands for fine and gross motor functions and she did not use an assistive device for ambulation[.]

Even the most recent evidence received since earlier periods of adjudication fails to confirm [Pallo's] allegations of physical disability. [C]urrent treating records until January 2015 from her current pain management physician [] regarding her ability to perform exertional activities do not indicate any greater restrictions necessary, than limiting her to performing sedentary work. [T]reatment notes … only show clinical evidence of tenderness in the lumbar spine and decreased sensory in distribution of L4-L5 and L5-S1. Motor strength was grossly intact. Deep tendon reflexes were normal and neurological examination was normal. She also related relief in her pain with Tramadol and Trazadone. [U]pdated records . . . do not show any deterioration in [Pallo's] condition. I note neurological examination was intact. Babinski, Hoffman and Romberg signs were negative. Examination of the extremities was negative for edema, varicosities and pulses were equal.

The question of credibility is germane.  [Pallo's] recitation of her problems were [not] entirely credible.  For instance, she does however see a pain management doctor and takes both OxyContin and Xanax.  Please note the comments by the intake worker that [Pallo] appeared at her interview to be 'dazed and confused' despite there being no allegation of cognitive issues. At the hearing, [Pallo] said that she is now taking morphine, also from a pain management specialist.  [Pallo] said that the pain comes from her back and knee (from time to time and carpel tunnel).  She also alleges depression and anxiety. She said she does not want to go out (although she does continue to drive and run errands.).  She also alleges PTSD from a relatively minor car accident.  She lives with her mother and her 5-year-old child.  She said that she does not care for him due to the medication that she is on.  She said that she does literally nothing, her mother does everything, she was a bit unclear about back surgery.  She has never had any but she initially said she declined but then said she was still considering.  She said that no doctor has ever suggested she have a carpel tunnel release and she has no treatment for this, the only doctor she sees is her pain management doctor whom she sees once a month.  She said she sleeps all day but then said she does not sleep at night. When I asked if she has ever mentioned to her doctor that the drugs he gives her cause her to do nothing and she is not even able to care for [her] child and she said she has never mentioned it to him.

As for the opinion evidence, . . . a physical residual functional capacity questionnaire [was submitted] for [Pallo] regarding her claim of disability, finding [Pallo] limited to less than sedentary work[.]  Nonetheless, in considering all the opinions, I have incorporated some restrictions in her ability to perform the full range of sedentary work except she is limited to frequent but not continual fine finger manipulation, bilaterally and due to side effects of pain and medication, she is limited to simple and repetitive tasks, as this is supported by the record.  Even [Pallo] conceded at the hearing that she was capable of much greater exertional activity . . . .

Notably, in a subsequent Function Report(s) prepared August 2013 and in her testimony, [Pallo] reported somewhat of a reduction in her activities of daily living, this was after she had been denied benefits by the Administration on the initial and reconsideration levels.  Accordingly, she was motivated to decrease the extent of her activities during her testimony.  Despite her current claims of functional decline, the medical evidence shows no significant objective change in her medical condition to warrant such a change in functioning.  In my judgment, the daily activities [Pallo] has reported, when considered in conjunction with the objective medical evidence, are not consistent with a finding of disability.

15

The statements of [Pallo's] mother . . . does not establish that [Pallo] is disabled. [Pallo's mother] is not medically trained to make exacting observations . . . the accuracy of the testimony is questionable. Moreover . . . the witness cannot be considered a disinterested third party . . . . Most importantly, significant weight cannot be given to the witness's statements because it, like [Pallo's], is simply not consistent with the preponderance of the opinions and observations by medical doctors in this case.

[T]he above residual functional capacity assessment is supported by the clinical findings of . . . the orthopedic consultative examiner[,] and the report of the psychiatric consultative examiner[,] who noted [Pallo] does light cooking and the objective signs and finding in the records from her treating medical source[,] I find that [Pallo's] impairment-cased exertional limitations do not preclude all work activity and support a conclusion that [Pallo] retains the residual function capacity to perform work. I also concur with the assessment that [Pallo] is not disabled from all work activity[.]

6. [Pallo] is unable to perform any past relevant work[.]

[Pallo] has past relevant work as a customer service representative. Since [Pallo's] past relevant [work] was simple and repetitive [sic], I find she is unable to perform past relevant work.

7. [Pallo] was born on November 10, 1982 and was 29 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date[.]

8. [Pallo] has at least a high school education and is able to communicate in English[.]

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocation Rules as a framework supports a funding that the claimant is "not disabled," whether or not [Pallo] has transferable job skills[.]

10. Considering [Pallo's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]

In determining whether a successful adjustment to other work can be made, I must consider [Pallo's] residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines[.]

If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the Medical-Vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon [Pallo's] specific vocational profile[.]  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the Medical-Vocational rules are used as a framework for decision making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations[.]  If [Pallo] has solely nonexertional limitation, . . . the Medical-Vocational Guidelines provides a framework for decision making[.]

If [Pallo] had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed . . . .  However, [Pallo's] ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled sedentary occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with [Pallo's] age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as scale operator (DOT#737.687-126), with 75,000 jobs in the national economy; preparer (DOT#700.687-062), with 100,000 jobs in the national economy; and table worker (DOT#739.687-182), with 100,000 jobs in the national economy.

[I] have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, I conclude that, considering [Pallo's] age, education, work experience, and residual functional capacity, [Pallo] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate . . . .

11. [Pallo] has not been under a disability, as defined in the Social Security Act, from December 3, 2011, through the date of this decision[.]

(Id. at 15-23 (citations omitted).)  The ALJ, based on these conclusions, determined that

Pallo was not entitled to Benefits.  (See id. at 23.)

17

Pallo sought review of the Decision by the Social Security Administration Appeals Council ("Appeals Council") on May 25, 2015.  (Dkt. 5-2 at 9.)  The Appeals Council denied the request for review of the Decision on August 6, 2015.  (Dkt. 5-2 at 2-5.)  Pallo filed the Complaint before this Court on October 9, 2015, seeking judicial review of the Decision.  (See dkt. 1.)  See 42 U.S.C. § 405(g); Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91 (3d Cir. 2007) ("Because the Appeals Council denied review of the ALJ's decision, we review that decision as the final decision of the Commissioner.")

## DISCUSSION

### A.    Standard of Review

The Court has jurisdiction to review the ALJ Decision, but the review is limited. 42 U.S.C. § 405(g).  The Court has plenary review of all legal issues.  Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  But, the Court may only review the ALJ's findings of fact to determine whether they are supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck, 181 F.3d at 431.  Substantial evidence, as defined in this context, "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Zimsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014) (internal quotation marks and citation omitted).  Substantial evidence "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  Id. (internal quotation marks and citation omitted).

"[T]he substantial evidence standard is a deferential standard of review."  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (internal citation omitted).  The Court will not set aside the ALJ Decision "if it is supported by substantial evidence, even if we would

18

have decided the factual inquiry differently."  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Nevertheless, the Court "retain[s] a responsibility to scrutinize the entire record[.]"  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).


### B.    The Five Step Analysis

Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits.  20 C.F.R. §§ 404.1520, 416.920.

**Step 1**:  Determine whether the claimant has engaged in substantially gainful activity since the onset date of the alleged disability.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, move to step two.

**Step 2**:  Determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant has a severe impairment or combination of impairments, move to step three.

**Step 3**:  Determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If so, the claimant is disabled; if not, move to step four.  20 C.F.R. §§ 404.1520(d), 416.920(d).

**Step 4**: Determine whether, despite any severe impairment, the claimant retains the RFC to perform past relevant work.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  If

the claimant has the RFC to do her past relevant work, the claimant is not disabled. If not, move to step five.

**Step 5**:  At this point, the burden shifts to the Social Security Administration to demonstrate that the claimant, considering her age, education, work experience, and RFC is capable of performing jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); see Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91–92 (3d Cir. 2007).  If so, benefits will be denied; if not, they will be awarded.

### C.     Analysis

Pallo challenges the ALJ's decision on three fronts: (1) the ALJ erred in finding Pallo's mental impairments were not "severe;" (2) the VE's testimony relied upon by the ALJ was inconsistent with the Dictionary of Occupational Titles ("DOT") and therefore it cannot be considered substantial evidence that Pallo can perform jobs in the national economy; and (3) the ALJ's RFC finding failed to accurately portray Pallo's physical and mental limitations.

### 1.  Pallo's Mental Impairments

Pallo asserts the ALJ erroneously concluded her mental impairments were not "severe" (see dkt. 9 at 20-22), a determination made at step two of the sequential evaluation process.  Specifically, Pallo faults the ALJ for rejecting the opinions of two state experts that concluded Pallo's mental impairments were "severe."  (See id. at 20-21.)  She highlights prior medical diagnoses and treatment history concerning mental impairments and their effect on her physical condition. (See id. at 21-22.)

20

Defendant contends that the ALJ's step two finding is supported by substantial evidence.  (See dkt. 10 at 16-20.)  Defendant also contends that the ALJ's determination that Pallo's mental health impairment was not "severe" is irrelevant because the ALJ did not decide the claim at that step and, therefore, this claimed error cannot be cause for remand.  (See id. at 20-21.)  The Court agrees with Defendant.

To reach his conclusion that Pallo does not have any "severe" mental impairments, the ALJ assessed functional limitations using the four broad functional areas set forth in the disability regulations for evaluating mental disorders.  See 20 C.F.R.  Pt. 404, Subpt. P., App. 1, § 12.00(C).  To find a "marked" limitation, it must be more than moderate but less than extreme and the degree of limitation is such as to interfere seriously with the ability to function independently, appropriately, effectively, and on a sustained basis.  Id.

First, with respect to activities of daily living, the ALJ found Pallo has a mild limitation.[4]  The ALJ based his finding primarily on Pallo's statements in her first Adult Function Report.  Pallo reported in her first Adult Function Report that she was able to take care of her personal needs without difficulty, was able to take care of her son, could make simple meals, complete light housework, drive a car, shop in stores and handle money.  (See dkt. 5-6 at 5-12.)  The Court finds that substantial evidence supports the

---

[4]  According to the Social Security regulations, "[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1).

ALJ's conclusion that Pallo did not exhibit a marked limitation in activities of daily living.

Second, the ALJ found no limitation with respect to activities of social functioning.[5]  Strength in social functioning may be exhibited by an ability to initiate social contact with others, communicate clearly with others, or interact and actively participate in group activities.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2).  Despite reporting that she had difficulty getting along with others, Pallo indicated that she visited her family's houses. (See dkt. 5-6 at 9.)  She also demonstrated an ability to communicate and interact with doctors.  (See dkt. 5-9 at 78-81; dkt. 5-10 at 99-100.)  The Court finds that substantial evidence supports the ALJ's conclusion that Pallo did not exhibit a marked limitation in activities of social functioning.

Third, the ALJ found that Pallo has only a mild limitation in the functional area of concentration, persistence, or pace.[6]  The ALJ based his finding on Pallo's ability to take care of her personal needs, manage her finances, care for her son, prepare meals, shop in stores, and watch television for extended periods of time. (Dkt. 5-2 at 16.)  Additionally, the ALJ noted that Pallo demonstrated the ability to sustain focused attention and

---

[5]  According to the Social Security regulations, "social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2).

[6]  According to the Social Security regulations, "[c]oncentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3).

concentration during her disability hearing, an arguably stressful event.  (Id. at 16-17.)
The Court finds that substantial evidence supports the ALJ's conclusion that plaintiff did
not exhibit marked restriction in concentration, persistence, or pace.  Finally, the ALJ
found no episodes of decompensation which have been of extended duration.[7]

　　　　Because plaintiff's mental impairments cause no more than "mild" limitations in
any of the first three functional areas and "no" episodes of decompensation which have
been of extended duration in the fourth area, the ALJ properly found them nonsevere. (Id.
at 17.)  Further, the ALJ's decision to discount the opinions of two state experts was
supported by substantial evidence.  "When a conflict in the evidence exists, the ALJ may
choose whom to credit but cannot reject evidence for no reason or for the wrong reason.
The ALJ must consider all the evidence and give some reason for discounting the
evidence she rejects."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (internal
quotation marks and citation omitted).  Here, the ALJ considered the reports, but
explained that the state agency opinions regarding Pallo's mental impairments were not
supported by the medical record and were inconsistent with her reported abilities.  (See
id. at 15-16.)  The Court finds there is substantial evidence to support the ALJ's finding
that Pallo's mental impairments are not "severe."

---

[7]  According to the Social Security regulations, "[e]pisodes of decompensation are
exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive
functioning, as manifested by difficulties in performing activities of daily living, maintaining
social relationships, or maintaining concentration, persistence, or pace.  Episodes of
decompensation may be demonstrated by an exacerbation in symptoms or signs that would
ordinarily require increased treatment or a less stressful situation (or a combination of the two)."
20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).

Even if the ALJ had erroneously concluded that Pallo's mental impairments were not "severe," any error would be harmless.  As noted in <u>Salles v. Comissioner of Social Security</u>, when an ALJ finds in the claimant's favor at step two, "even if he had erroneously concluded that some of [his] impairments were non-severe, any error [is] harmless." 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 553 (3d Cir. 2005)).

Here the ALJ found in Pallo's favor at step two. (<u>Id.</u> at 15.)  Further, her RFC included certain limitations that reflect functional difficulties related to Plaintiff's mental health impairments. (<u>Id.</u> at 17-18.)  Therefore, this asserted error presents no basis for remand.

### 2. Unresolved Conflict Between the VE's Testimony and the Dictionary of Occupational Titles

Pallo asserts that the VE's testimony was inconsistent with the DOT, and that the ALJ failed to exercise his affirmative responsibility to ask about the conflict.  <u>See</u> SSR 00-4P, 2000 WL 1898704.[8]  Specifically, Pallo argues that the ALJ's hypotheticals posed

---

[8]  The relevant portion of SSR 00-4P provides:

When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT.  In these situations, the adjudicator will:

Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and

If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4P, 2000 WL 1898704 at *4.

at the March 12, 2015 hearing called for jobs with a GED reasoning level of 1, because the hypothetical restricted the individual to "simple and repetitive jobs such as those involved in one and two-step processes to completion to account for the side effects of pain and/or side effects of medication."[9]  (Dkt. 9 at 17-18)   Pallo asserts that a conflict was created when the VE responded by providing the ALJ with GED reasoning level 2 jobs.[10]  (Id. at 18-19.)

Defendant contends that there was no apparent unresolved conflict between the VE's testimony and the DOT that would require the ALJ to inquire further under SSR 00-4P.  (See dkt. 10 at 21-23.)  Defendant also contends that one of the jobs the VE provided was in fact a GED level 1 job, contrary to Plaintiff's assertion, and therefore substantial evidence still supports the ALJ's conclusion. (See id. at 23-24.)

Where an apparent, unresolved conflict exists about every position identified by the VE, the court generally must remand.  See Boone v. Barnhart, 353 F.3d 203, 208 (3d Cir. 2003).  However, an unexplained inconsistency between the VE's testimony and the DOT is not *per se* fatal to the ALJ's determination so long as substantial evidence exists

---

[9]  A job with a GED reasoning level of 1 requires skills to "[a]pply commonsense understanding to carry out simple one- or two- step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." DOT, App. C, 1991 WL 688702.

[10]  A job with a GED reasoning level of 2 requires skills to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations."  DOT, App. C, 1991 WL 688702.

in the record to support the ALJ's finding.  Rutherford v. Barnhart, 399 F.3d 546, 557 (3d

Cir. 2005) (internal citations omitted).

      The Third Circuit, as well as district courts within the Third Circuit, have held that

there is no conflict between "simple, repetitive tasks" and a GED reasoning level of 2.

See Money v. Barnhart, 91 F. App'x 210, 215 (3d Cir. 2004) ("Working at reasoning

level 2 would not contradict the mandate that her work be simple, routine and

repetitive"); Jones v. Astrue, 570 F. Supp. 2d 708, 715-16 (E.D. Pa. 2007) (finding "no

apparent consistency between the limitations [of simple, repetitive tasks] in the ALJ's

RFC determinations and the level two reasoning ability required of the addresser job

identified by the VE"); Tollivers v. Astrue, No. 11-6358, 2013 WL 427096 at *6 (D.N.J.

Feb. 1, 2013) (finding no conflict between GED reasoning level 2 and limitation of

performing simple work).

      In this case, however, the ALJ's hypothetical restricted the individual to "simple

and repetitive jobs such as those involved in one and two-step processes to completion to

account for the side effects of pain and/or side effects of medication."  (Dkt. 9 at 17-18.)

The limitation of "one and two-step processes" may arguably correspond with a level one

reasoning level requirement, potentially creating a conflict.  See Rounds v. Comm'r Soc.

Sec. Admin., 807 F.3d 996, 1003-04 (9th Cir. 2015).  The Court need not address this

issue because substantial evidence exists in the record to support the ALJ's finding.

Rutherford, 399 F.3d at 557.

As Defendant points out, the VE identified the position of table worker.  (Dkt. 5-2 at 37-38.)[11]  The position of table worker has a GED reasoning level of 1.  See DOT 739.687-182, 1991 WL 680217.  Therefore, the VE's testimony, at least with respect to the position of table worker, was consistent with the DOT.

The burden at the fifth step of the sequential analysis may be satisfied if the ALJ identifies at least one occupation with a significant number of jobs in the national economy that the claimant can perform.  See Wilkinson v. Comm'r of Soc. Sec., 558 F. App'x 254, 256 (3d Cir. 2014) (citing 20 C.F.R. §§ 404.1566(b), 416.966(b)).  Here, the VE testified that the position of table worker exists in numbers of 100,000 nationally. (Id. at 38.)  As a result, substantial evidence exists in the record to support the ALJ's finding.

### 3.  The ALJ's RFC Assessment

Finally, Pallo asserts that the ALJ's RFC finding is deficient because it failed to accurately portray her individual physical and mental limitations.    (See dkt. 9 at 19-20.) Specifically, Pallo argues that the RFC failed to account for her limitations in "maintaining concentration, persistence, or pace," including "being off-task during an eight-hour workday."  (Id.)

---

[11]  A table worker is defined as a person who "[e]xamines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles.  DOT 739.687-182, 1991 WL 680217.

Defendant contends that the ALJ limited Plaintiff to only simple and repetitive tasks, which appropriately encapsulates all limitations stemming from a "mild" limitation in concentration, persistence, or pace. (See dkt. 10 at 24-27.)

The Court agrees with Defendant.  As discussed supra, the ALJ's conclusion that Pallo has only a mild limitation in the functional area of concentration, persistence, or pace is supported by substantial evidence.  The Third Circuit has found a limitation to simple and repetitive tasks to be adequate to encompass mild limitations in concentration, persistence, or pace. See Najmi–Nejad v. Barnhart, 75 F. App'x 60, 64 (3d Cir. 2003) (limiting individual to simple routine work sufficiently accounted for deficiencies of "concentration, persistence, or pace"); McDonald v. Astrue, 293 F. App'x 941, 946 (3d Cir. 2008) (limiting individual to "simple, routine tasks" to account for "moderate limitations with his ability to maintain concentration, persistence and pace"). Accordingly, we find that the ALJ adequately accounted for the credibly established limitations that fall within the functional area of concentration, persistence, or pace when he limited Pallo to simple and repetitive tasks.

## CONCLUSION

For the reasons discussed above, the Court will affirm the Decision of the Commissioner.  The Court will issue an appropriate Order.


   s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

Date:  December 16, 2016